E. C. KNIGHT v. THE ALBEMARLE AND RALEIGH RAILROAD
COMPANY.

*Railroad, Construction of—Damages from Overflow of Water—
Negligence—Prescription—Estoppel.*

Where a railroad company, in the construction of its road, erected an em-
bankment leading to a bridge over a stream, whereby the natural
channel of the stream was considerably contracted, and plaintiff's
lands became liable to frequent overflows, but were not made en-
tirely useless for agricultural purposes, being cultivated with
varying results each year, and the damages such as could have
been apportioned from time to time: *Held,*

1. It was the duty of the railroad to so construct its road that a sufficient
space should be left for the discharge of the water through its
accustomed channel, whether artificial or natural, and this duty
is a continuing one.

2. It was not contributory negligence on the part of the plaintiff to con-
tinue planting crops on the lands so subject to overflow.   (*Emry* v.
*Railroad,* 109 N. C., 598, distinguished).

3. The delay of the plaintiff for a period less than twenty years to notify
the company of his injuries, could not estop him or give the com-
pany a prescriptive right to maintain the embankment without
liability for damages.

CIVIL ACTION, tried at EDGECOMBE Superior Court, Spring
Term, 1892, *Brown, J.,* presiding, to recover damages from
flooding land.

The plaintiff testified in substance:

The lands lie right on Conetoe creek, and are known as the
"Hopkins place."   I have known Conetoe creek since 1872.

The railroad embankment was originally constructed in 1869; a portion of it washed away immediately after it was built, and it was rebuilt in 1882. The creek at the railroad is seven hundred and twenty yards wide; the average height of the railroad embankment across it is about four and one-half feet, in some places five feet. One hundred and thirty-six yards (of the stream) is entirely cut off by the railroad embankment. Prior to the railroad embankment, it was seldom the water got over the land; it had one hundred and thirty-six yards more to run off in. When it was running over the county road it ponded water very little on my land, only on the lowest parts of it. Prior to the building of the railroad we never had any water, and I never heard of such a thing. We never failed to make a good crop before the railroad. My experience since the building of the railroad in 1882 is that we have been more or less troubled with water every year. Since the building of the railroad I have seen at least one-half of my land flooded; it could not have been caused by the county dam. Free from the interference of the overflow, and a fair crop season, my land yields a bale of cotton to the acre. My damage in 1888 was $1,000.

After the railroad was built, in 1882, I never made another fair crop. We have had trouble with water ever since 1883. Ever since the construction of the railroad I have been troubled with water, more or less; this same dam of which I now complain has ponded it back on me. Before the railroad was constructed, in 1882, the water ran off my land in twenty-four hours in a wet spell. In 1889 it did not run off. Generally, it takes from ten to fifteen days. This did not occur so every year, but it did occur in 1887, 1888 and 1889. I took no action on account of this damage until March, 1890. Ordinary and usual rains will pond my land by reason of the railroad; it would not take an extraordinary rain to do it; heavy rains pond the water. My cultivated land is right on the creek—ten feet of the creek. I very readily

111—6

detected the damage done by the railroad embankment. The creek has very little fall, about as little as any I am acquainted with; it is a broad, flat low ground. We made a tolerably good crop in 1883; 1884 was dry, and we made a tolerably good crop; 1885 was a wet year. We had a freshet in June; after that we had no big rains. In 1886 we had a freshet the last of May. We kept on planting in 1887, 1888 and 1889 as long as the season would permit planting.

There was other testimony offered by plaintiff in support of his evidence.

The defendant introduced no testimony.

Among other instructions, the defendant prayed the Court to instruct the jury that, upon the plaintiff's testimony, he is not entitled to recover in this action    Refused.  Exception by the defendant.

The defendant moved, at the close of the evidence, for judgment, upon the ground that the plaintiff's own evidence showed contributory negligence, and that the action be dismissed. Motion denied. Exception by the defendant.

Among other things, the Court instructed the jury as follows:

"The third issue relates to what the law calls contributory negligence, and the Court is of the opinion, after careful consideration, that the evidence is not sufficient to show contributory negligence, therefore the Court instructs you to answer the third issue, No."

The jury rendered their verdict, finding all issues for the plaintiff, and from the judgment rendered thereon the defendant appealed.

*Mr. Don. Gilliam,* for plaintiff.
*Mr. J. L. Bridgers,* for defendant.

SHEPHERD, J.: "It is the duty of a railroad company, in constructing its road-bed, to leave a space sufficient for the

discharge of the water through its accustomed drain-way, whether natural or artificial. If it fails to do so, any owner whose land is injured, whether he be one, a part of whose land is taken for the road or not, may compel the company to discharge its duty by opening the drain to its previous capacity." *Railroad* v. *Wicker*, 74 N. C., 220. This duty is a continuing one (*Brown* v. *Railroad*, 83 N. C., 128), and the space to be kept open must be sufficient "to carry off the water of the stream under all ordinary circumstances and the usual course of nature, even to the extent of such heavy rains as are ordinarily expected." *Emry* v. *Railroad*, 102 N. C., 209

The defendant, having demurred to the evidence, must be deemed to have admitted its truthfulness in the aspects most favorable to the plaintiff (*Bond* v. *Wool*, 107 N. C., 146), and viewed in this light, and applying the foregoing well-established principles, it cannot be doubted that it establishes negligence on the part of the defendant in the construction of its embankment over Conetoe creek at the point indicated by the witnesses. The testimony abundantly shows that in 1882 the defendant so altered its embankment as to extend it farther into the stream, thus decreasing the width of the latter, according to the plaintiff's statement, one hundred and thirty-six yards. It also appears that, in consequence of this alteration, the water was obstructed in its passage, the lands of the plaintiff flooded, and his crops thereby endamaged.

In order to escape liability for its negligent conduct, the defendant insists that the plaintiff ought not to have planted any crops during the years mentioned in the complaint on the lands thus subject to occasional overflow; and that in doing so he was guilty of contributory negligence, and is therefore not entitled to recover.

It will be observed that there is nothing in the testimony to show that the use of the land for agricultural purposes

was entirely destroyed,  On the contrary it appears that the plaintiff cultivated the land with varying results since the alteration of the embankment in 1882  In 1883 and 1884 he made " tolerably good crops " and, while he was seriously injured more or less from year to year until the commencement of this action, the damage was nevertheless but partial in its character and could easily have been apportioned from time to time.

The contention of the defendant that, under these circumstances, the plaintiff was guilty of contributory negligence, would, if sanctioned by judicial authority, work such a complete subversion of the rights incident to the ownership of real estate, as well as of the ancient and usual remedies provided for the redress of their invasion, that only a slight recurrence to fundamental principles is necessary to demonstrate its unsusceptibility of being sustained as a correct legal proposition.

"The right of property," says Mr. Blackstone (1 vol., 139), "is an absolute right inherent in every Englishman, and consists in the free use, enjoyment and disposal of all his acquisition without any control or diminution save by the laws of the land."  It is guaranteed by Magna Charta, whose great principles form a part of our fundamental law; and except in the exercise of the right of eminent domain, not even the government itself, with all its powers and resources, much less a private person or corporation, can compel the owner, either to part with his property or impose upon it any servitude that tends to impair its value or obstruct its uninterrupted enjoyment.  Especially is this so in respect to land, which species of property, says PEARSON, J. (7 Ired. Eq., 192), is "a favorite and favored subject in England and every country of Anglo-Saxon origin," and, in relation to which, courts of equity are constantly decreeing the specific performance of contracts because of the *pretium affectionis*, which cannot be estimated by mere dollars and cents.

If the principle insisted upon by the defendant be admitted, these great privileges, which have been guarded for centuries with such anxious solicitude, may easily be invaded, and, without authority of law, the owner may be forced to part with the actual use of his land by any person, either natural or artificial, who may be able to respond in damages.

The result is all the more remarkable when we consider that it is to be accomplished by a breach of duty to the owner. In other words, while I may be unable to purchase my neighbor's land, or the right to subject it to any burden for my benefit, I may nevertheless practically effectuate my purpose by the erection and maintenance of a nuisance, and, instead of being compelled to abate the nuisance by successive actions for damages, I may purchase immunity for its further continuance by the payment of a yearly pecuniary consideration.

The proposition is aptly illustrated by the facts of the present case; for if the plaintiff can only plant his crops at the risk of incurring the penalty of forfeiting all rights to compensation for the injuries resulting from the unlawful acts complained of, then he must abandon his land altogether to the use of the defendant, and thus be deprived of his property against his consent and the organic law of the land. On the other hand, the consequences to the defendant and other similar corporations, would, in many instances, be none the less serious; for if the owner is guilty of contributory negligence in planting his crops where there has been only partial and occasional injury for several years, he would of course be justified in folding his hands in idleness and thus recover the full rental value of his premises from year to year, although during a part of the time he might have cultivated his crops with but trifling damage, if any. To say nothing of the contravention of public policy because of the diversion of land from agricultural uses, a strong temptation would be afforded to idleness and cupidity, and railroad companies might

unjustly be compelled to substantially lease the lands of adjacent proprietors by reason of slight or pretended injury to their crops for a few preceding years.

The intelligent counsel for the defendant was unable to refer us to any direct authority in support of the principle under consideration. In *Emry* v. *Railroad* (109 N. C., 589), cited by him, the plaintiff was asked "whether or not the water was backed by the culvert upon his land every year since he owned it, so as to damage his crops and brick-yard, or whether the ponding back of water was done at intervals, some years there being no ponding of water." He replied that "this did not occur every year, but did occur about an average of four years out of five years." The Court held that "no prudent business man would place and keep his brick-yard and brick-kilns at a place like that in question, where he would hazard the loss or serious injury described by the plaintiff for four years out of five," and that he was guilty of contributory negligence. The case is easily distinguishable from the former one between the same parties (102 N. C., 209), in which a recovery was permitted for damages inflicted to the plaintiff's brick-yard and kilns during the year 1887, it only appearing that the brick-yard had been flooded and damaged in the year 1885. There is a vast difference between a flooding for one previous year and an accustomed overflow of four out of every five years.

We cannot understand how the decision in the first case can be considered as authority in the one now before us.

In our case, the injury was inflicted while the owner was using his land in the ordinary course of agriculture, and he had no option but to cultivate or abandon it. The use of it for the manufacture of brick is exceptional, besides the necessary machinery may be moved from one point to another; and in Emry's case (109 N. C.) it did not appear that the industry could not have been conveniently and profitably conducted on a part of the premises not subject to overflow.

Neither is the case from Wisconsin (*Hassa* v. *Junger*, 15 Wis., 598) in point, as there the plaintiff could have put up the division fence and sued the defendant for the expenses occasioned by his pulling it down.   He should not have planted his crop without making the necessary repairs, as the fence was on his own land and he could easily have protected himself against injury.   *Roberts* v. *Cole*, 82 N. C., 292.

Under the view we have taken of the rights of an owner respecting the ordinary use of his lands as against one who maintains a nuisance of the character complained of in this action, the other authorities relied upon by the defendant are inapplicable.   The simple acquiescence alone of the plaintiff for several years, or his failure to notify the defendant of his injury, cannot, by way of estoppel or otherwise, affect his common law remedy.   "His recovery can be defeated only by proof of a prescriptive right acquired by (twenty years) user to maintain the culvert in its present state with the consequent injury."   *Emry* v. *Railroad*, 102 N. C., 232.   The duty of the defendant was a positive and continuing one, and the failure to perform it is in no way excused by the mere silence for a few years of the party in whose favor the duty existed. Wood's Law of Nuisance, §§ 360 and 798.

Affirmed.